1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK OWEN LAUN,<br><br>       Petitioner,<br><br>  v.<br><br>ORANGE COUNTY SHERIFF,<br><br>       Respondent. | Case No.  8:18-cv-02226-JVS-KES<br><br>ORDER GRANTING PETITIONER'S<br>STAY MOTION (DKT. 8) |

## I.

## INTRODUCTION

Mark Owen Laun ("Petitioner") filed a habeas petition under 28 U.S.C. § 2254 ("Petition") challenging his 2017 conviction for domestic violence crimes including assault with a deadly weapon.  (Dkt. 1 at 1.[1])  Petitioner is currently on probation supervised by the Orange County Sheriff's Department.

In January 2019, the Court issued an Order to Show Cause ("OSC") why the Petition should not be dismissed without prejudice as entirely unexhausted.  (Dkt. 4.)  Petitioner responded to the OSC by acknowledging that his direct appeal is

---

[1] Page citations are to the pagination imposed by the Court's electronic filing system, CM/ECF.

ongoing and moving for a stay under <u>Rhines v. Weber</u>, 544 U.S. 269 (2005).  (Dkt. 6, 8.)  Respondent opposed the stay motion, arguing that abstention under <u>Younger v. Harris</u>, 401 U.S. 37 (1971) requires a dismissal without prejudice.  (Dkt. 11.)  Petitioner did not file a reply.  For the reasons explained below, Petitioner's request for a stay is granted.

## II.

## FACTUAL BACKGROUND

These facts are provided for context to understand Petitioner's claims and the procedural posture of the state and federal proceedings.  They are taken from Petitioner's Opening Appellate Brief ("OAB"), which was filed by Petitioner's counsel in the California Court of Appeal.  (Dkt. 12-1, Lodged Document ["LD"] 1.)[2]

Petitioner was charged with domestic battery with corporal injury (Cal. Pen. Code § 273.5(a); count 1) and assault with a deadly weapon (<u>id.</u> § 245(a)(1); count 2).  (OAB at 14.)  The prosecution also alleged personal use of a deadly weapon as to count 1 and personal infliction of great bodily injury as to counts 1 and 2 (Cal. Pen. Code §§ 12022(b)(1) and 12022.7(a)).  (<u>Id.</u>)

**A.    <u>Prosecution Evidence.</u>**

Petitioner lived in Irvine.  (OAB at 15.)  In February 2015, Petitioner and Jane Doe, a resident of Nanning, China, met online.  In May or June 2015, Petitioner visited Doe for approximately two weeks in Nanning, and in December 2015, Doe moved in with Petitioner.  Petitioner and Doe married within a week of her arrival and Doe began attending an English language school.  (<u>Id.</u> at 16.)

Over time, the bed that Petitioner shared with Doe aggravated a condition

---

[2] The OAB cites to the Reporter's Transcript and Clerk's Transcript from Petitioner's trial, but Respondent has not lodged those transcripts.  Before any future decision reaching the merits of Petitioner's claims, the Court would likely require Respondent to lodge those transcripts.

1    that caused sexual intercourse to become painful for her.  Petitioner became

2    angered by Doe's reluctance to have sex with him.  On or about June 22, 2016,

3    Petitioner took Doe to see a chiropractor.  When they returned home, Petitioner

4    forced Doe to have sex with him.  Doe decided to return to China.  (Id. at 16.)

5          On the morning of June 29, 2016, Doe "took back" her passport.  At

6    approximately 10:47 p.m., Petitioner broke a beer bottle and used the broken bottle

7    top to stab Doe in her right arm, below her shoulder.  An Irvine Police Department

8    ("IPD") officer arrived after receiving a call for assistance.  He saw Doe outside,

9    who appeared frightened and bleeding.  (Id. at 16.)

10         About twenty minutes later, IPD officers entered the building where

11   Petitioner and Doe lived.  In a garbage can, they found a broken beer bottle top, and

12   broken glass remained on the floor near the desks.  They also found a suitcase on

13   the floor.  When officers asked Petitioner to explain the glass and the blood, he told

14   them that Doe may have cut her feet on the glass and he did not know Doe's

15   location.  (Id. at 17.)

16         Doe's stab wound was treated at a local hospital where she received stiches.

17   (Id. at 17.)

18   **B.**    **Defense Evidence.**

19         On March 19, 2015, sixteen days after meeting through a dating website, Doe

20   e-mailed Petitioner a message stating that she loved him and wanted an exclusive

21   relationship with him.  On March 25, 2015, Doe told Petitioner that she could

22   obtain a marriage visa easier than an employment visa.  Petitioner researched the

23   visa requirements and visited Doe in Nanning for approximately two weeks in May.

24   During this visit, they agreed to marry.  (Id. at 18.)

25         When Petitioner returned to Irvine, he initiated the visa application process,

26   which took approximately six months to complete.  Doe arrived on December 11,

27   2015, and Petitioner and Doe married on December 19, 2015.  (Id. at 18.)

28         Soon after, Petitioner became concerned regarding Doe's commitment to the

marriage.  She did not want to go on a honeymoon, she seemed uninterested in him, and her willingness to have sex with him declined rapidly.  After several months, Doe told Petitioner that the bed aggravated her lower back or pelvic area.  She slept on the floor.  Petitioner took Doe to a chiropractor for treatment.  (Id. at 18.)

By May 2016, Petitioner understood that Doe had little interest in him as a sexual partner.  Petitioner and his pastor discussed Petitioner's suspicion that Doe had married him to obtain entry to the United States.  Doe told Petitioner that if he believed she had defrauded him, he should send her back to China.  (Id. at 19.)

On the evening of June 27, 2016, Doe displayed no interest when Petitioner attempted to show her pictures from his youth.  Petitioner decided to end the marriage.  At about 1:00 a.m. on June 28, 2016, Petitioner sent Doe an e-mail informing her of his decision and proposing that he give her $1,000 and buy her a ticket to fly back to China.  At about 5:00 p.m. on June 28, 2016, Doe sent Petitioner an e-mail which listed various dates and times.  Petitioner believed that Doe had attempted to "document" invented incidents of abuse.  (Id. at 19.)

At approximately 5:45 p.m. on June 29, 2016, Petitioner suggested that he and Doe use their computers (with translation software) to discuss their arrangements.  Petitioner informed Doe that he intended to pursue annulment of the marriage based on her fraudulent intent to secure a visa.  Doe responded that Petitioner had made her afraid but did not explain how.  Petitioner and Doe agreed that Doe would return to China the next day.  (Id. at 19.)

At approximately 7:10 p.m., Petitioner retrieved Doe's suitcases from the storage area of the building and brought them to the bedroom.  At approximately 9:29 p.m., after consuming two sleeping tablets and two alcoholic drinks, Petitioner met Doe in the bedroom and told her that he intended to fall asleep while watching a movie.  At 9:30 p.m., Petitioner retrieved his headphones from his company workstation.  Using his headphones, Petitioner sat at his desk in the bedroom watching the movie "Tombstone."  Soon thereafter, Petitioner fell asleep in his

4

1    chair.  When he last noticed Doe, she sat at her desk, speaking on her phone,

2    wearing her nightgown.  (Id. at 20.)

3         When Petitioner woke up, the movie had ended and all lights in the room had

4    been turned off.  Near his feet, he noticed glass broken into small pieces.  Due to

5    Doe's absence and to the small size of the glass pieces – which did not suggest a

6    bottle or glass falling to the floor from his desk – Petitioner became suspicious that

7    Doe had executed a plan of some kind to remain in the United States.  Moments

8    later, Petitioner heard IPD officers approaching the bedroom.  (Id. at 20-21.)

9         During the marriage, Petitioner bought Doe a car and gave her driving

10   lessons.  Petitioner never kept possession of Doe's passport or forced himself upon

11   her sexually.  (Id. at 21.)

12        An IPD investigator interviewed Doe on June 30, 2016.  Doe said that

13   Petitioner had attacked her on the bed, not at her desk as she subsequently testified.

14   The investigator spoke with others who knew the couple but received no

15   information corroborating Doe's accusation that Petitioner stabbed her.  Petitioner

16   assisted the investigator in obtaining and reviewing security camera footage from

17   his apartment building.  That footage did not show Doe exiting the building in

18   panic as if chased by Petitioner with a broken bottle.  It showed that she was not

19   looking behind her, and when she exited the front door, she paused to prop it open.

20   (Id. at 21-22.)

21        Two of Petitioner's co-workers testified that they had never known Petitioner

22   to behave in a violent or angry manner, and they had never seen Doe appear upset

23   or injured.  (Id. at 22-23.)  Petitioner's pastor could speak with Doe in Mandarin,

24   and he testified that Doe never reported any abuse to him, and he never saw any

25   signs of abuse.  (Id. at 23.)  When the pastor told Doe that Petitioner was concerned

26   Doe had entered the marriage under false pretenses, Doe told the pastor that she did

27   not want to discuss her marriage.  (Id. at 24.)

28

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.**

**PROCEDURAL HISTORY**

On November 21, 2017, following trial, a jury convicted Petitioner on counts 1 and 2, and found the personal use of a deadly weapon enhancement to count 1 proven; however, the jury found the personal infliction of great bodily injury enhancements to counts 1 and 2 not proven. (OAB at 14.) Petitioner was sentenced to five years in prison, but that sentence was suspended, and he was placed on three years of probation. (OAB at 12; Dkt. 1 at 1.)

Petitioner filed a direct appeal, case no. G055893. (OAB at 1.) Per the online docket (last accessed by the Court on April 30, 2019), the case is fully briefed and awaiting oral argument. (LD 4.)[3]

In December 2018, Petitioner filed a pro se habeas petition in the California Court of Appeal, case no. G057123. (LD 5.) In that petition, he asserts that his public defender refused to demand that the broken beer bottle be tested for fingerprints and to retain an expert who could opine on whether Doe's injury was self-inflicted. (Id. at 13.)   When his public defender refused to prepare his defense as he wished, Petitioner exhausted his savings to retain private counsel. (Id. at 13.) He argues that retained counsel was ineffective for not calling a witness willing to testify that, before the incident, she told Doe that if she claimed spousal abuse, she could obtain a green card – testimony that would have impeached Doe's testimony she did not know about the Violence Against Women Act. (Id. at 19.) Petitioner contends that his lawyer also could have presented evidence that Doe had pursued a marriage visa with two other men and had called legal aid groups with grants related to the Violence Against Women Act minutes before stabbing herself in the arm. (Id. at 21-22.) He also asserts that in May 2018, a friend told him that Doe

_____

[3] The online dockets of the California Courts of Appeal are available at: https://appellatecases.courtinfo.ca.gov/.

6

1   had confessed to the friend's Mandarin-speaking wife that Doe had framed
2   Petitioner for domestic violence to gain permanent residency under the Violence
3   Against Women Act.  (Id. at 11-12.)

4       On January 3, 2019, the Court of Appeal requested a response to the petition.
5   (LD 6 at 1.)  The State filed a response in March (LD 6), and Petitioner filed a reply
6   on April 15, 2019 (per the online docket) (LD 7).

7       Thus, both Petitioner's direct appeal and state habeas petition are pending,
8   and Petitioner has not yet presented any claims to the California Supreme Court.

9                               **IV.**

10                            **CLAIMS**

11      Petitioner does not list his claims in the standard petition form; he instead
12  refers to a Memorandum of Points and Authorities (the "Memo").  (Dkt. 2.)  The
13  Memo identifies at least the following eight claims for relief:

14      (1)   Actual innocence based on later-discovered evidence (id. at 3);

15      (2)   Ineffective assistance of appellate counsel (id.);

16      (3)   Ineffective assistance of trial counsel (id. at 6, 12);

17      (4)   Trial court erred by denying his motion for a new public defender
18            under People v. Marsden, 2 Cal. 3d. 118 (1970) (id. at 7);

19      (5)   Trial court erred by denying his pro se motion for a new trial (id.);

20      (6)   Prosecutorial misconduct (id. at 8);

21      (7)   Instructional error (id. at 18); and

22      (8)   Juror misconduct violating Petitioner's right to a fair trial by an
23            impartial jury (id. at 27).

24                               **V.**

25                           **DISCUSSION**

26  **A.    Law Governing Exhaustion and Stay Motions.**

27      All claims in a federal habeas petition must be exhausted before a federal
28  court may grant the petition; if all or some of the claims have not been exhausted,

7

then the petition is subject to dismissal.  <u>Rose v. Lundy</u>, 455 U.S. 509, 522 (1982).

Exhaustion requires that the petitioner's claims be fairly presented to the highest

court in a state system even if that court's review is discretionary and even where

the claims depend on federal law.  <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845-47

(1999); <u>James v. Giles</u>, 221 F.3d 1074, 1077 n.3 (9th Cir. 2000).  To satisfy the

exhaustion requirement, a habeas petitioner must fairly present his or her federal

claims in the state courts in order to give the State the opportunity to pass upon and

correct alleged violations of the prisoner's federal rights.  <u>Duncan v. Henry</u>, 513

U.S. 364, 365 (1995) (per curiam) (holding due process claim not exhausted where

state petition asserted only erroneous evidentiary ruling).  Typically, exhaustion is

accomplished by raising a claim either on direct appeal or by filing a petition for

writ of habeas corpus in state court.  In California, a federal claim is "fairly

presented" for purposes of exhaustion "if the petitioner has described the operative

facts and legal theory upon which his claim is based" in a filing presented to the

California Supreme Court.  <u>Tamapua v. Shimoda</u>, 796 F.2d 261, 262 (9th Cir.

1986).

     Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996

("AEDPA"), all federal habeas petitions are subject to a one-year statute of

limitations, and claims not exhausted and presented to the federal court within the

one-year period are forfeited.  28 U.S.C. § 2244(d).  Under <u>Rhines v. Weber</u>, 544

U.S. 269 (2005), a district court has discretion to stay a wholly unexhausted petition

to allow a petitioner to exhaust his claims in state court without running afoul of

AEDPA's one-year statute limitations period.  <u>Id.</u> at 273-75; <u>Mena v. Long</u>, 813 F.

3d 907, 912 (9th Cir. 2016).  A district court may stay a petition under <u>Rhines</u> if:

(1) the petitioner has "good cause" for his failure to exhaust his claims; (2) the

unexhausted claims are potentially meritorious; and (3) there is no indication that

the petitioner intentionally engaged in dilatory tactics.  <u>Id.</u> at 278.

     While stay and abeyance should be available only in "limited

circumstances," the good cause standard does not require a petitioner to show "extraordinary circumstances" to obtain a stay.  <u>Jackson v. Roe</u>, 425 F.3d 654, 661-662 (9th Cir. 2005).  The existence of "good cause turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence, to justify" the failure to exhaust his claims earlier.  <u>Blake v. Baker</u>, 745 F.3d 977, 982 (9th Cir.), <u>cert. denied</u>, 135 S. Ct. 128 (2014).  For example, lack of timely access to trial transcripts, despite diligent efforts to obtain them, can constitute good cause.  <u>See</u> <u>Willis v. Paramo</u>, No. 14-8942, 2015 U.S. Dist. LEXIS 38584 at *4 n.3, 2015 WL 1383513 at *1 n.3 (C.D. Cal. Mar. 25, 2015).  So too can the lack of counsel in state post-conviction proceedings.  <u>Dixon v. Baker</u>, 847 F.3d 714, 720-22 (9th Cir. 2017).

**B.**     **Summary of the Parties' Arguments.**

Petitioner argues that he has "good cause" for a stay, because if his Petition is dismissed now without prejudice, he may be out of custody by the time his exhaustion efforts end, and this would deprive federal courts of jurisdiction to hear his claims.  (Dkt. 8 at 2.)  District courts only have jurisdiction to consider habeas petitions filed by state inmates who allege that they are "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Whether a petitioner is "in custody" for purposes of establishing jurisdiction is determined as of the date when the habeas petition was filed.  <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998).

Respondent counters by raising three arguments.  First, Respondent contends that the <u>Younger</u> abstention doctrine mandates dismissal without prejudice.  (Dkt. 11 at 2-3.)  Second, Respondent argues that the Petition is "premature" because Petitioner's direct appeal is ongoing.  (<u>Id.</u> at 4.)  Third, Respondent argues that even if the Court engages in a <u>Rhines</u> analysis, Petitioner has not shown good cause because it is speculative that his state exhaustion efforts will extend beyond his probation which ends in January 2021.  (<u>Id.</u> at 5.)

1    Of the three <u>Rhines</u> factors, Respondent does not argue that Petitioner's

2   claims lack potential merit or that he engaged in intentional delay.  Respondent

3   only challenges Petitioner's showing of good cause for failing to exhaust his claims

4   earlier.  (<u>Id.</u>)

5   **C.    <u>Younger Abstention.</u>**

6    In the seminal case of <u>Younger v. Harris</u>, 401 U.S. 37 (1971), after

7   Defendant Harris was indicted for violations of California's Criminal Syndicalism

8   Act, he sued in federal court to enjoin his prosecution, contending that the Act was

9   an unconstitutional restraint on free speech.  The United States Supreme Court

10  determined that Defendant Harris's situation did not present the "factors necessary

11  under equitable principles to justify federal intervention …."  <u>Id.</u> at 54.

12  Specifically, he had failed to show that his prosecution would result in "irreparable

13  injury" that was "both great and immediate."  <u>Id.</u> at 46.  The Court noted that injury

14  in the form of "the cost, anxiety, and inconvenience of having to defend against a

15  single criminal prosecution" was not an irreparable injury for purposes of obtaining

16  equitable relief in federal court.  <u>Id.</u>

17   "<u>Younger</u> exemplifies one class of cases in which federal-court abstention is

18  required: When there is a parallel, pending state criminal proceeding, federal courts

19  must refrain from enjoining the state prosecution."  <u>Sprint Commc'ns, Inc. v.</u>

20  <u>Jacobs</u>, 571 U.S. 69, 72 (2013).  <u>Younger</u> abstention is rooted in "a strong federal

21  policy against federal-court interference with pending state judicial proceedings

22  absent extraordinary circumstances."  <u>Middlesex County Ethics Comm. v. Garden</u>

23  <u>State Bar Ass'n</u>, 457 U.S. 423, 431 (1982).  <u>Younger</u> abstention promotes comity,

24  an idea that encompasses "a proper respect for state functions, a recognition of the

25  fact that the entire country is made up of a Union of separate state governments,

26  and a continuance of the belief that the National Government will fare best if the

27  States and their institutions are left free to perform their separate functions in their

28  separate ways."  <u>Id.</u> (citing <u>Younger</u>, 401 U.S. at 44).  "Minimal respect for the

10

1    state processes, of course, precludes any presumption that the state courts will not

2    safeguard federal constitutional rights."  Id.

3         The Supreme Court has cautioned, however, that "[a]bstention is not in order

4    simply because a pending state-court proceeding involves the same subject matter"

5    and that "[c]ircumstances fitting within the Younger doctrine … are

6    'exceptional[.]'"  Sprint, 571 U.S. at 72-73.  Such exceptional circumstances exist

7    only where the state court proceedings are (1) "state criminal prosecutions," (2)

8    "civil enforcement proceedings," or (3) "civil proceedings involving certain orders

9    that are uniquely in furtherance of the state courts' ability to perform their judicial

10   functions."  Id. at 73 (quoting New Orleans Public Service, Inc. v. Council of City

11   of New Orleans, 491 U.S. 350, 368 (1989)).

12        If the state court proceedings at issue fall into one of these three categories,

13   federal courts ask whether the state proceeding: (1) is going, (2)  implicates

14   important state interests, and (3) provides an adequate opportunity to raise federal

15   challenges.  Id. at 81 (citing Middlesex, 457 U.S. at 432 and noting that these are

16   "additional factors appropriately considered by the federal court before invoking

17   Younger" in a quasi-criminal context); see also Gilbertson v. Albright, 381 F.3d

18   965, 969 (9th Cir. 2004) (noting that the Middlesex factors "guide consideration of

19   whether Younger extends to noncriminal proceedings").  "If these 'threshold

20   elements' are met, [the Ninth Circuit] then consider[s] whether the federal action

21   would have the practical effect of enjoining the state proceedings and whether an

22   exception to Younger applies."  ReadyLink Healthcare, Inc. v. State Comp. Ins.

23   Fund, 754 F.3d 754, 759 (9th Cir. 2014).

24        Here, it is clear that granting the Petition now would interfere with ongoing

25   state criminal proceedings.  But the Court does not see how permitting Petitioner to

26   file the Petition now and then holding it in abeyance while he completes his state

27   appeals and collateral review would interfere with California's interests.  See

28   Medina v. Woodford, No. 06-2480, 2006 U.S. Dist. LEXIS 75282 at *6, 2006 WL

2844578 at *2 (N.D. Cal. Oct. 2, 2006) (concluding, "nothing in <u>Younger</u> explicitly conflicts with <u>Rhines</u>" and "granting the Petitioner's application for a stay under <u>Rhines</u> will not violate the <u>Younger</u> abstention doctrine").  In fact, in another context, the Ninth Circuit has held that certain claims should be stayed based on <u>Younger</u> rather than dismissed.  <u>See</u> <u>Gilbertson v. Albright</u>, 381 F.3d 965, 968 (9th Cir. 2004) (en banc) (where a federal action seeking damages implicates <u>Younger</u> principles, the "damages actions should be stayed until the state proceedings are completed" rather than dismissed).  This indicates that a stayed federal proceeding does not improperly interfere with state interests.

In sum, abstention under <u>Younger</u> is not required.

**D.    <u>Prematurity.</u>**

Respondent argues that Petitioner must wait for a final judgment in his state criminal proceedings before seeking federal habeas relief under § 2254, citing <u>Collins v. People of the State of California</u>, No. 11-3280-GW (JPR), 2011 U.S. Dist. LEXIS 152366, 2011 WL 7109341 (C.D. Cal. Dec. 8, 2011) and <u>Henderson v. Martel</u>, No. 09-2189, 2010 U.S. Dist. LEXIS 51882, 2010 WL 2179913 (E.D. Cal. May 26, 2010).  (Dkt. 11 at 4-5.)  For the reasons discussed below, the Court finds these cases distinguishable or unpersuasive.

<u>Henderson</u> cited the following language from <u>Edelbacher v. Calderon</u>, 160 F.3d 582, 583 (9th Cir. 1998): "When there is a pending state penalty retrial and no unusual circumstances, we decline to depart from the general rule that a petitioner must await the outcome of the state proceedings before commencing his federal habeas corpus action."  The Ninth Circuit based its holding in <u>Edelbacher</u>, in part, on the fact that until the petitioner's penalty retrial was complete, it was impossible to designate the case as "capital" or "non-capital," a designation that would determine which federal rules to apply.  <u>Id.</u> at 585.  This reasoning does not apply to Petitioner's situation.

Moreover, <u>Edelbacher</u> predated the 2005 decision in <u>Rhines</u> and therefore did

not consider whether the type of "protective" federal petition contemplated by
Rhines was appropriate.  The "general rule" cited in Edelbacher "that a petitioner
must await the outcome of the state proceedings before commencing his federal
habeas corpus action" was established in Sherwood v. Tomkins, 716 F.2d 632 (9th
Cir. 1983), which held, "When … an appeal of a state criminal conviction is
pending, a would-be habeas corpus petitioner must await the outcome of his appeal
before his state remedies are exhausted, even where the issue to be challenged in
the writ of habeas corpus has been finally settled in the state courts."  716 F.2d at
634 (footnote omitted); see Edelbacher, 160 F.3d at 582-83 (distinguishing Phillips
v. Vasquez, 56 F.3d 1030, 1036-37 (9th Cir. 1995), which found that the Sherwood
rule did not apply).  Post-Rhines, the Ninth Circuit has explained that "Sherwood
does not undermine the important precedent requiring district courts … if
requested, to consider a petitioner's eligibility for a stay under Rhines…."
Henderson v. Johnson, 710 F.3d 872, 874 (9th Cir. 2013) (reversing dismissal of
mixed petition because the district court failed to consider the petitioner's request
for leave to amend or to stay the petition).

Additionally, the two district court decisions cited by Respondent are
factually distinguishable.  In Henderson v. Martel, No. 09-2189, 2010 U.S. Dist.
LEXIS 51882, 2010 WL 2179913 (E.D. Cal. May 26, 2010), the petitioner had
completed his direct review, but he won resentencing via state habeas proceedings.
In 2009, he was resentenced to a ten-year term.   He was pursuing an appeal of his
resentencing when he filed a federal petition raising the claims he exhausted on
direct appeal.  The district court concluded that it would be "imprudent" to grant
him a stay because his AEDPA limitations period had not yet begun, and it
dismissed the § 2254 petition as "premature."  2010 U.S. Dist. LEXIS 51882 at *7-
9, 2010 WL 2179913 at *2-3.  The court found, "[P]etitioner's concern that his
federal habeas petition will be rendered untimely if he returns to state court to
exhaust his claims is unfounded given the somewhat unique circumstances posed

13

here." 2010 U.S. Dist. LEXIS 51882 at *4, 2010 WL 2179913 at *2. Because of the petitioner's 10-year term, the <u>Henderson</u> court had no reason to consider whether the petitioner would be out of custody before completing his appeal , i.e., the reason given by the present Petitioner for filing a protective petition and requesting a stay.

In <u>Collins v. People of the State of California</u>, No. 11-3280-GW (JPR), 2011 U.S. Dist. LEXIS 152366, 2011 WL 7109341 (C.D. Cal. Dec. 8, 2011), the petitioner was in custody awaiting the conclusion of two separate state prosecutions. He filed a § 2254 petition challenging, on due process grounds, a "prior strike" allegation that would potentially lengthen his sentence under California law, if convicted. He also moved for a <u>Rhines</u> stay. The district court dismissed the petition without prejudice, citing <u>Henderson</u> and <u>Younger</u> abstention, and noted, "[T]his is not an appropriate case to stay and hold in abeyance. … Petitioner's state court proceedings are nowhere near final, as the direct-appeal process has not even begun. Thus, he is in no danger of missing the one-year statute of limitation under 28 U.S.C. § 2244(d) for filing a federal habeas petition…." 2011 U.S. Dist. LEXIS 152366 at *4-7, 2011 WL 7109341 at *3. Thus, as in <u>Henderson</u>, the court considered whether Petitioner's AEDPA deadline would expire before he could file a federal petition, but it did not consider whether the petitioner would be out of custody before completing his appeal. Petitioner later re-filed his federal petition, and the prior dismissal without prejudice had no adverse effect. <u>See</u> <u>Collins v. McDonnell</u>, No. 14-2404-GW (JPR), Dkt. 26 (C.D. Cal. Apr. 8, 2015) (dismissing all but one claim as procedurally barred); <u>Id.</u>, 2015 U.S. Dist. LEXIS 189020, 2015 WL 13388197 (C.D. Cal. Dec. 15, 2015), <u>report & recommendation adopted at</u> 2017 U.S. Dist. LEXIS 87546, 2017 WL 2468767 (C.D. Cal. June 6, 2017) (dismissing remaining claim on the merits).

In <u>Houze v. California</u>, No. 12-0686, 2013 U.S. Dist. LEXIS 18214, 2013 WL 500859 (E.D. Cal. Feb. 11, 2013), the district court was forced to decide what

14

1   to do where it had dismissed an earlier § 2254 petition without prejudice as

2   "premature" and the petitioner was no longer in custody when he re-filed the

3   petition.  The court noted that pro se pleadings must be construed liberally, and that

4   it could construe the second petition as a motion under Federal Rule of Civil

5   Procedure 60(b) to reopen the previous case and treat the second petition "as part of

6   the previous case, as if a stay had been granted in that case pursuant to Rhines."

7   2013 U.S. Dist. LEXIS 18214 at *12, 2013 WL 500859 at *5.  The court reasoned

8   that a Rhines stay might have been available to the petitioner in the previous action,

9   had he known to ask for it, as follows:

10          Rhines … provides that the federal habeas court may stay a mixed

11          petition for good cause pending further exhaustion.  The Supreme

12          Court adopted this rule to address the problem of habeas petitioners

13          who, due to dismissal of their mixed petitions in the context of

14          AEDPA's statute of limitations, "run the risk of forever losing their

15          opportunity for any federal review of their unexhausted claims."

16          Rhines, 544 U.S. at 275.  The same risk is run by a petitioner who

17          satisfies the custody requirement when a mixed petition is filed, but

18          who is no longer "in custody" within the meaning of the statute when

19          the federal court chooses to dismiss or stay the petition.  In the

20          timeliness context, any abuse of discretion in denial of a stay can be

21          remedied by application of equitable tolling to render a later filed and

22          newly exhausted petition timely.  See Jefferson [v. Budge, 419 F.3d

23          1013, 1017 (9th Cir. 2005)] (granting equitable tolling where mixed

24          petition had been improperly dismissed).  No such option is available

25          in the context of the custody requirement because it, unlike the statute

26          of limitations, is jurisdictional.

27   2013 U.S. Dist. LEXIS 18214 at *14-15; 2013 WL 500859 at *5.  The court

28   construed the new filing as a Rule 60 motion but ultimately concluded that the

15

1  petitioner could not have obtained a <u>Rhines</u> stay because his claims were "plainly
2  meritless."  2013 U.S. Dist. LEXIS 18214 at *15; 2013 WL 500859 at *6.

3      Courts in other parts of the country have found that the possibility that a
4  petitioner will lose the opportunity for federal habeas review constitutes "good
5  cause" for granting a <u>Rhines</u> stay.  For example, in <u>Gerber v. Varano</u>, 512 F. App'x
6  131 (3d Cir. 2013), the petitioner did not complete his direct appeal and instead
7  elected to pursue exhaustion of his claim for relief via collateral review.  <u>Id.</u> at 133.
8  He filed a § 2254 petition while his state proceedings were ongoing; the respondent
9  moved to dismiss it as unexhausted, and the petitioner moved for a <u>Rhines</u> stay.
10 The district court dismissed the petition without prejudice as unexhausted, did not
11 rule on the <u>Rhines</u> motion, and denied a certificate of appealability ("COA").  <u>See</u>
12 <u>Gerber v. Varano</u>, 2012 U.S. Dist. LEXIS 104495 at *12-13, 2012 WL 3061756 at
13 *2-4 (M.D. Pa. July 26, 2012).

14     The Third Circuit found that the district court's failure to address the <u>Rhines</u>
15 motion merited a COA, and it remanded the case for consideration of the <u>Rhines</u>
16 arguments.  The Third Circuit explained why a <u>Rhines</u> stay might be available, as
17 follows:

18     Gerber argues that if he fully serves his state sentences, and ceases to
19     be "in custody," he may lose the ability to pursue *either* state or
20     federal postconviction remedies.  There is some merit to his concern.
21     Under [Pennsylvania's Post-Conviction Relief Act or "PCRA"] …
22     completion of a sentence renders PCRA relief unavailable, regardless
23     of the collateral consequences of those sentences.  <u>Commonwealth v.</u>
24     <u>Hart</u>, 2006 PA Super 324, 911 A.2d 939, 942 (Pa. Super. Ct. 2006)
25     (collecting cases).  By contrast, the federal "in custody" requirement
26     simply looks to the date that the petition is filed, and completion of a
27     prisoner's sentence does not moot the petition.  <u>Leyva v. Williams</u>,
28     504 F.3d 357, 363, 368 n.16 (3d Cir. 2007).  If, during the pendency

16

of PCRA proceedings, Gerber is released from prison and is not
otherwise in custody, the state courts may deem his PCRA petition
moot and he might not continue to be "in custody" for the purposes of
filing a separate federal habeas petition.

Gerber, 512 F. App'x at 135.

On remand, the district court found that Gerber had established good cause
for a Rhines stay because, in part, if he "fully serves his state sentences and ceases
to be 'in custody,' he may lose the ability to pursue either his state of federal
postconviction remedies." Gerber v. Varano, No. 12-0818, 2013 U.S. Dist. LEXIS
202329 (M.D. Pa. Feb. 22, 2013) (order granting stay); see also Gerber v. Varano,
No. 12-0818, 2015 WL 5008934 at *2 (M.D. Pa. Aug. 20, 2015) (later order noting
that the court had stayed the proceedings while Gerber attempted to exhaust his
state post-conviction remedies).  Pennsylvania district courts have relied on Gerber
to grant Rhines stays to habeas petitioners in similar situations.  See, e.g., Moss v.
Deblaso, No. 19-106, 2019 U.S. Dist. LEXIS 4677 at *6-7, 2019 WL 1298566 at
*3 (M.D. Pa. Mar. 21, 2019) (granting Rhines stay to a petitioner sentenced to a
maximum term of two years, where the petitioner's appeal was still pending;
finding that the likelihood that the petitioner would be out of custody before
completing state exhaustion constituted good cause for a stay); Credico v.
McFadden, No. 17-3672, 2018 U.S. Dist. LEXIS 100756 at *12-13, 2018 WL
3233366 at *6 (E.D. Pa. June 14, 2018) (granting Rhines stay to petitioner
sentenced to one-year probation who had not filed a direct appeal but was pursuing
PCRA relief; finding "good cause for a stay because dismissal might jeopardize
Petitioner's ability to re-file a habeas petition" and noting that, "when faced with an
ambiguous situation, the District Court should, out of abundance of caution, err on
the side of ensuring that the litigant's opportunity to seek federal habeas review is
preserved").

1    Pennsylvania petitioners are admittedly in a somewhat different situation

2 from Petitioner, a California petitioner, since their release from custody would end

3 their ability to pursue state law post-conviction relief.  Gerber, 512 F. App'x at 135.

4 California courts, like federal courts, are not required to dismiss a habeas petition

5 upon the petitioner's release from custody.  See In re Perez Hernandez, 33 Cal.

6 App. 5th 530 (2019) ("When a petitioner is in custody at the time the petition is

7 filed, the petitioner's later discharge does not deprive the trial court of jurisdiction

8 because, once acquired, the court's jurisdiction continues throughout the proceeding

9 and any appeals."); Chaker v. Crogan, 428 F.3d 1215, 1219 (9th Cir. 2005) ("[I]f a

10 petitioner is in custody at the time he files his federal habeas petition, his

11 subsequent release from custody does not deprive the court of its jurisdiction.").

12    Yet Pennsylvania is not the only state where district courts have found good

13 cause for a Rhines stay based on the possibility that a petitioner will be released

14 from custody.  See, e.g., Hanif v. Stewart, No. 15-0145, 2017 U.S. Dist. LEXIS

15 137916 at *18 (S.D. Ala. Aug. 25, 2017) ("Given the procedural oddities of Hanif's

16 case, this Court cannot in good conscience determine that Hanif – who has

17 diligently attempted to exhaust his state court remedies and who would likely be

18 prevented from re-filing his federal petition should his current petition be dismissed

19 – has failed to present good cause for staying his federal petition.")[4]; Brown v.

20 Michigan, No. 05-72440, 2006 U.S. Dist. LEXIS 29620 at *19-20 (E.D. Mich. May

21 16, 2006) (Because Petitioner is "no longer in custody … if the Court were to

22 dismiss the petition outright, the Court would lack jurisdiction over any future

23 habeas petition challenging Petitioner's conviction.  …  The preclusion of habeas

24

25    [4] The August 25, 2017 report and recommendation in Hanif was withdrawn
26 after the petitioner alerted the court all of his state court actions had concluded.
Hanif v. Stewart, No. 15-0145, Dkt. 43 (S.D. Ala. Sept. 29, 2017).  This Court
27 nevertheless finds the reasoning of this withdrawn report and recommendation
28 persuasive.

18

1    review under such circumstances justifies a stay of the proceedings.").

2        Based on these authorities, the Court is persuaded that it is not required to

3    dismiss the Petition without prejudice as "premature" and may consider whether

4    Petitioner has demonstrated "good cause" for a <u>Rhines</u> stay.  This approach is

5    consistent with the goals of preserving Petitioner's opportunity to obtain federal

6    habeas relief, and it avoids the procedural gymnastics (discussed in <u>Houze</u>) of

7    construing any future petition as a motion for relief from any judgment entered in

8    this case.

9    **E.    <u>Rhines Analysis.</u>**

10       Petitioner has demonstrated good cause for failing to exhaust his state claims

11   earlier, in that he is diligently pursuing both a direct appeal and collateral review,

12   but he has not yet reached the point under state law where he can present his claims

13   to the California Supreme Court.  His short probationary period will likely end

14   before he is able to complete exhaustion.  Granting Petitioner a <u>Rhines</u> stay will not

15   cause or sanction any delay, consistent with the rationale behind the "good cause"

16   requirement.

17       As noted above, Respondent has not challenged Petitioner's claims as plainly

18   meritless.  On the current record—particularly considering the allegations discussed

19   above in the Factual Background section of this order—the Court cannot say that "it

20   is perfectly clear that the petitioner has no hope of prevailing" on his federal habeas

21   claims.  <u>Dixon</u>, 847 F.3d 714, 722 (9th Cir. 2017) (quoting <u>Cassett v. Stewart</u>, 406

22   F.3d 614, 625 (9th Cir. 2005)).

23                                    **VI.**

24                                **CONCLUSION**

25       Petitioner has shown good cause for a <u>Rhines</u> stay, the claims he seeks to

26   exhaust are not plainly meritless, and he has not engaged in dilatory litigation

27   tactics.  IT IS THEREFORE ORDERED that:

28       1.    Petitioner's Stay Motion (Dkt. 8) is GRANTED and this action is

1   STAYED.

2        2.        Within 60 days of this Order and every 60 days thereafter, Petitioner

3   must file a brief Status Report advising this Court of the status of his exhaustion

4   efforts.  Petitioner should attach to those Status Reports: (1) a copy of any new

5   habeas petition(s) that he files in any California courts, and (2) a copy of any order

6   he receives ruling on those habeas petitions or on matters raised in his direct appeal.

7

8   DATED:  May 02, 2019

9

10                                      KAREN E. SCOTT

11                                      United States Magistrate Judge